Filed 9/19/18; Modified and certified for pub. 10/9/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JOHN DOE, | B281961 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS159753) |
| v. | |
| UNIVERSITY OF SOUTHERN CALIFORNIA, et al., | |
| Defendants and Appellants. | |

APPEAL from the judgment of the Superior Court of Los Angeles County, Howard L. Halm, Judge.  Reversed and remanded.

Cole Pedroza, Kenneth R. Pedroza, Maureen M. Home; Law Offices of Denise Ann Nardi and Denise A. Nardi for Defendants and Appellants University of Southern California and Ainsley Carry.

The Law Offices of John Derrick and John Derrick for Plaintiff and Respondent.

————————————

The superior court granted former University of Southern California student John Doe's petition for writ of administrative mandamus and ordered USC's Office of Student Judicial Affairs and Community Standards (SJACS) to vacate its decision to discipline Doe for violating the university's academic integrity standards. On appeal USC[1] contends the superior court erred in concluding there was insufficient evidence to support the SJACS's finding that Doe and a second student had cheated on the final examination in Biology 220. In response Doe asserts, even if the administrative record contains substantial evidence of his academic dishonesty, the superior court's judgment should be affirmed because USC's internal discipline and review procedures as applied in this case lacked fundamental fairness and did not comply with the university's own rules, an argument the superior court rejected.

Although reasonable factfinders could disagree, substantial evidence supports USC's decision that Doe cheated, a determination reached after a fair, albeit less than perfect, process. Accordingly, we reverse the judgment and remand with directions to the superior court to deny the petition for writ of administrative mandamus.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Allegations of Cheating*

On May 27, 2015 the professors and the laboratory manager for USC's course BISC 220, General Biology: Cell

---

[1] Dr. Ainsley Carry, sued in his then-official capacity as USC's Vice Provost for Student Affairs, is also an appellant. No issue raised in the appeal is specific to Dr. Carry. For simplicity, the opinion refers only to USC.

Biology and Physiology, after speaking with Doe about their concerns, submitted a report of academic integrity violation to SJACS. The report stated the professors believed Doe and a second student (identified in the case as Student B) had shared answers on the final examination through written notes on their examination booklets and recommended a grade sanction of "F" for the course.

According to the report, the belief that cheating had occurred was based on the following facts: Doe and Student B sat next to each other and had the same version of the multiple choice examination although two versions with shuffled questions were usually distributed in a manner intended to ensure that adjacent students would receive different versions.[2] Doe's and Student B's Scantron® answer sheets had identical answers for 46 of the 50 questions, the greatest number of identical answers of all 8,002 pairs of students who took the same version of the examination.[3] Both Doe and Student B wrote proposed answers in large letters in the left margin of the examination booklets that would have been visible to the student seated next to each of them; Student B had written proposed answers for all 50

---

[2] The report stated Doe and Student B could have been given the same version of the examination because the teaching assistants distributed them from both sides of the row, "which is not our usual procedure," but that "the exams could also have been intentionally swapped during the test distribution."

[3] The anomalous pairing data were initially identified by a software program.

3

questions; Doe for 33 questions.[4]  Comparison of the proposed answers to the students' Scantron® answers indicated a pattern of sharing answers:  On all but one question where Doe wrote a proposed answer in the margin, Student B filled in the Scantron® with that answer.[5]  Only two of Doe's answers on his Scantron® sheet differed from Student B's proposed answers for those questions for which Doe did not write a proposed answer in the margin.  Student B outperformed his historical average (a "C") by answering 40 of the questions correctly; Doe maintained his performance level, answering 42 questions correctly.

A course professor and the laboratory manager spoke to Doe and Student B separately about their concerns.  Both students denied any wrongdoing, and each stated he always writes answers in the margins of multiple choice examinations before filling in the Scantron® sheet to facilitate checking answers before completing the test.

    2. *USC's Disciplinary Process and the Finding of Academic Dishonesty*

      a. *The summary administrative review*

Based on the faculty report, Doe was advised he was accused of violating the university's Student Conduct Code sections 11.13.A, which prohibits external assistance during an

---

[4]     Subsequent review of the examination papers showed that Student B wrote proposed answers for 47 of the 50 questions although he indicated answers to two additional questions with circles on the examination, rather than letters in the margin; Doe wrote proposed answers for 34 questions, not 33.

[5]     In fact, two of Student B's answers on his Scantron® were different from those proposed answers.  The faculty's initial analysis transposed the proposed answers to Question 38.

4

examination, including copying or attempting to copy material from another student and allowing another student to copy from an examination or assignment; 11.15.A, which prohibits attempting to benefit from the work of another; and 11.21, which prohibits any act that gains or is intended to gain an unfair academic advantage by an act of academic dishonesty. Doe was provided with a summary of the student conduct review process and referred to the portion of the student handbook that described that process in detail. He was asked to schedule a meeting with the SJACS review officer assigned to the case.[6]

Upon receiving notice of the charges of academic dishonesty, Doe requested a copy of the faculty report that had been submitted to SJACS. Several days later Doe was provided a copy of the report itself, but not copies of the examination booklets with handwritten letters in the margins, the Scantron® answer sheets or the chart showing the faculty's comparison of answers. The review officer advised Doe he was allowed access to, but not copies of, the examination documents.

Doe met with the review officer on July 1, 2015 and described what had happened from his perspective. He insisted he had not cheated and had no motive to cheat based on his past performance in the Biology 220 course and his excellent overall academic standing at USC. As he had when contacted by the professor who prepared the initial report, Doe explained he wrote proposed answers for questions he wanted to check—one letter if he wanted to double check his answer; two letters if he was unsure of the answer; nothing in the margin if he was sure of the

---

[6]    The initial step in USC's disciplinary process is identified as a summary administrative review.

answer. Doe said he did not know how he came to have the same version of the examination as Student B. Doe accused Student B of cheating, suggesting he had copied from Doe's papers. Doe acknowledged he knew Student B, but said the two had not studied together for the examination.

The SJACS review officer told Doe, based on the current information in the case, he would find by a preponderance of the evidence that Doe had engaged in the charged academic violations. The review officer, however, intended to meet with Student B before reaching a final decision.

The review officer met with Student B several days later. According to the report ultimately prepared by the review officer, Student B disputed Doe's statement that the two had not studied together for the examination, recalling that they had done so on one or two occasions and had also communicated about the upcoming examination via text message and had viewed and discussed recorded course lectures together.

On July 15, 2015 Doe was notified that a suspension was being considered as a sanction because this was his second academic integrity violation[7] and was told he could have an attorney represent him in any further proceedings in the matter. On July 21, 2015 Doe, accompanied by his mother as his adviser, reviewed his own examination. Doe sent an email later that day asking that he be allowed to review both examinations and the Scantron® answer sheets. Approximately three weeks later, Doe,

---

[7] During the fall 2014 semester Doe had received a zero on a chemistry assignment after he submitted a lab report that used another student's data and calculations. After initially denying the misconduct, Doe eventually signed a form acknowledging his actions had violated the Student Conduct Code.

accompanied by his father, was allowed to review both examinations. At that time Doe gave the review officer the results of a polygraph examination to show he had not shared answers on the Biology 220 examination. He also submitted a character reference from one of his professors.

On August 14, 2015 Doe was given notice of the written decision from the summary administrative review and advised of his right to appeal to the Student Behavior Appeals Panel. The report concluded Doe was "responsible for gaining an unfair academic advantage during exam 4 in BISC 220 by collaborating with, providing answers to, and/or receiving answers from a classmate seated next to him." This conclusion was based on the highly unusual statistical similarities in the two students' examination papers, as described in the faculty report; the fact that Doe and Student B, although sitting next to each other, had the same version of the examination; the use by both students of large letters indicating proposed answers in the examination margins; and Student B's improved performance on this examination compared to his prior grades in the class. Because this was Doe's second act of academic dishonesty, the report imposed as sanctions an "F" grade in the course, a two-semester suspension and the requirement that Doe attend and successfully complete an ethics workshop.

b. *Doe's administrative appeal*

Doe appealed the review officer's decision to the Student Behavior Appeals Panel, filing a lengthy document with exhibits in support of his contentions the review officer's decision lacked evidentiary support, the review officer violated the procedural protections for students set forth in the Student Conduct Code

and the sanctions imposed were excessive.[8]  Doe argued Student B alone had cheated and contended that Student B was responsible for switching the examination papers so that he and Doe had the same version of the examination.  Doe described his outstanding academic record and insisted, "The notion that I would receive help from a student I have historically outperformed is illogical."  He also presented another faculty reference and statements from several students confirming that he had studied alone for the examination.  Doe also argued the two-semester suspension was excessive and asserted the SJACS decisionmaking process was procedurally unfair.

The three-member appeals panel denied Doe's appeal.  The SJACS report and appeals panel decision were then reviewed by the Vice Provost for Student Affairs, who approved the findings and sanctions imposed.

3. *The Petition for Writ of Administrative Mandamus and the Judgment in Favor of Doe*

Doe filed a petition for writ of administrative mandate in superior court on January 7, 2016 challenging the SJACS decision and the appeals panel's denial of his appeal on both procedural and substantive grounds.[9]  The petition requested an

---

[8]  Section 15.00 of the USC Student Conduct Code provides an appeal may be based on new evidence that is sufficient to alter the decision or the contention that the review officer failed to follow university rules or that the sanction imposed is excessive. The appeals panel does not reweigh the evidence.

[9]  The remedy of administrative mandamus is available to review adjudicatory decisions of private organizations, including universities.  (See *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 237 & fn. 9; *Gupta v. Stanford University*

immediate stay of all sanctions. The following day the court stayed Doe's suspension pending further order of the court.

Following briefing and oral argument, the court issued a 13-page written decision on February 17, 2017 granting Doe's petition, finding SJACS's decision to impose sanctions was not supported by substantial evidence. In its amended judgment entered March 14, 2017 the court ordered USC to vacate the SJACS administrative decision and the sanctions that had been imposed on Doe.

In its statement of decision the court concluded Doe had been provided a fair administrative hearing as required by Code of Civil Procedure section 1094.5, subdivision (b).[10] "Petitioner was provided with clear notice of the allegations against him and was informed of USC's written policies and procedures related to the administrative review process. All evidence that SJACS relied on in making its decision was made available to Petitioner for review, and Petitioner did in fact review this evidence. Petitioner had multiple face to face meetings with a representative of SJACS. At these meetings Petitioner was afforded the opportunity to object to the charges against him and explain his version of facts. All indications are that USC fully complied with its policies and procedures and conducted a fair hearing."

Turning to SJACS's findings, the court identified the following undisputed facts: "Petitioner and Student B sat next to each other during the exam. [¶] Although adjacent students

---

(2004) 124 Cal.App.4th 407, 411; *Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1722-1723.)

[10]     Statutory references are to this code.

9

were supposed to have different versions of the exam, Petitioner and Student B had the same version.  [¶]  Petitioner and Student B had the greatest number of identical answers out of every pair of students with their version of the exam (46/50 answers were answered identically).  [¶]  Both Petitioner and Student B wrote large proposed answers along the left-hand side of the of their exam question sheets that would be easily visible to a neighbor."  The court also explained, although disputed by Doe, "Student B stated that the two of them studied together for the exam, communicated about the exam via text message, watched recorded course lectures together, and discussed the recorded lectures together."

Referring to the facts it had just listed, both undisputed and disputed, and purporting to review the SJACS's decision for substantial evidence,[11] the court found, "Based on this evidence <u>alone</u>, a reasonable trier of fact could have concluded, as did SJACS, that Petitioner collaborated with, provided answers to,

---

[11]     The court rejected Doe's contention an independent judgment standard of review applied in this case because he purportedly had a vested contractual right and property interest in attending USC.  (See generally *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34 ["[w]hen an administrative decision affects a right which has been legitimately acquired or is otherwise 'vested,' and when that right is of a fundamental nature from the standpoint of its economic aspect or its 'effect . . . in human terms and the importance . . . to the individual in the life situation,' then a full and independent *judicial* review of that decision is indicated because '[the] abrogation of the right is too important to the individual to relegate it to exclusive administrative extinction'"].)  Doe has abandoned that argument on appeal.

and/or received answers from Student B during the examination." Nonetheless, the court stated it could not ignore the fact that 22 of the notations in the margins of the two students' examination question sheets were not the same. It asked rhetorically, "If Petitioner was 'cheating' either by receiving answers from Student B or sending answers to Student B, [USC] fails to explain how the 'cheating' was facilitated when 44% of the answers in the margins were not the same. How do two students sitting next to each other each score 92% (46/50 identical answers),[12] based on letter answers in the margins of each student's exam where 44% of them are not the same?" Implicitly answering its own question, the court then ruled, "The fact that 44% of the letter answers in the margins were not the same persuades this Court that there was, in fact, no substantial evidence to support the administrative body's determination because putting letter answers in the margins could not have caused the students to have 46 of 50 identical answers."

4. *USC's Appeal, Doe's Graduation and the Petition for Writ of Supersedeas*

USC filed a notice of appeal on April 10, 2017.

Because of the superior court's stay of his suspension during the pendency of the administrative mandamus proceedings, Doe was able to complete all necessary coursework

_____

[12] The superior court misunderstood USC's evidence. Although Doe and Student B answered 46 of 50 questions identically, only 42 of Doe's answers (84 percent) and 40 of Student B's answers (80 percent) were correct. This misunderstanding was also reflected in the court's order that USC remove Doe's grade of "F" in the course and "give Petitioner the letter grade that a score of 46/50 would achieve."

and graduated from USC on May 12, 2017 with a Bachelor of Science degree in Human Biology. However, USC refused to issue him a transcript pending resolution of its appeal.

On June 22, 2017 Doe petitioned Division Eight of this court, then assigned USC's appeal,[13] for a writ of supersedeas giving full effect to the superior court's judgment during the appeal. Relying on section 1094.5, subdivision (g), which provides, in part, "If an appeal is taken from the granting of the writ, the order or decision of the agency is stayed pending the determination of the appeal unless the court to which the appeal is taken shall otherwise order," Doe argued withholding his degree and his transcript, which he needed to apply to medical school and to seek employment, violated the automatic stay of the university's imposition of disciplinary measures. USC opposed the petition, contending the superior court had ordered it to give Doe an "A" in Biology 220, affirmative relief that was not subject to section 1094.5, subdivision (g)'s provision for an automatic stay.

On July 28, 2017 Division Eight granted Doe's petition and directed USC, pending resolution of the appeal and until further order, to "(1) reinstate John Doe as a student in good standing, (2) issue a transcript showing the grade to which he would otherwise be entitled absent the allegation of cheating, (3) allow Doe to register for classes, if he would otherwise be entitled absent the cheating allegation, and (4) issue Doe a diploma, if he would otherwise be entitled to it absent the cheating allegation."

---

[13] USC's appeal was transferred to Division Seven pursuant to California Rules of Court, rule 10.1000(b)(1)(A) on January 29, 2018.

12

**DISCUSSION**

1. *Standard of Review*

The question presented by a petition for writ of administrative mandate is whether the agency or tribunal that issued the decision being challenged "proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (§ 1094.5, subd. (b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

On appeal from the judgment on a petition for writ of administrative mandate in a case not involving fundamental vested rights, as here, we review the agency's findings, not the superior court's decision, for substantial evidence. (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239; see § 1094.5, subd. (c) ["abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record"]; see also *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1072 ["'The scope of our review from a judgment on a petition for writ of mandate is the same as that of the trial court.' [Citation.] 'An appellate court in a case not involving a fundamental vested right reviews the agency's decision, rather than the trial court's decision, applying the same standard of review applicable in the trial court.'"].)

We review the fairness of the administrative proceeding de novo. (*Doe v. University of Southern California, supra,* 246 Cal.App.4th at p. 239 ["'[a] challenge to the procedural fairness of the administrative hearing is reviewed de novo on

13

appeal because the ultimate determination of procedural fairness amounts to a question of law'"]; accord, *Doe v. Regents of University of California*, *supra*, 5 Cal.App.5th at p. 1073.) Section 1094.5, subdivision (b)'s requirement of a "fair trial" "means that there must have been 'a fair administrative hearing.'" (*Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 96.) "Where student discipline is at issue, the university must comply with its own policies and procedures." (*Doe v. University of Southern California*, at p. 239; see *Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1271.)

  2. *Substantial Evidence Supports USC's Finding of Academic Dishonesty*

  As discussed, it is undisputed that Doe and Student B sat next to each other during the final examination in Biology 220; had the same version of the examination although adjacent students were supposed to have different versions; answered 46 of the 50 examination questions identically, a highly anomalous statistical result; and wrote large letter answers in the margins of the examination booklets that would be visible to the students sitting next to them. Although Doe and Student B insisted they generally wrote answers in the margins of multiple choice examinations to facilitate checking their answers, the laboratory manager who participated in reporting the academic integrity violation stated in the summary of the incident that neither of the students had written anything next to the multiple choice questions on the fall semester Biology 120 final

14

examination.[14]  In addition, Student B, who performed better on the Biology 220 final than his "C" academic average, while denying he had cheated, contradicted Doe's claim that the two of them had not studied together for the examination.

We certainly agree with the superior court that these facts reasonably support the inference Doe provided answers to Student B and may have also received answers from him during the examination.  Contrary to the superior court's analysis, however, closer review of the pattern of answers by Doe and Student B, viewed in the context of the facts just recited, reinforces the conclusion that cheating occurred.  Doe wrote a single letter in the margin for 29 questions; Student B marked 28 of his answers to those questions, all but number 10, with the same letter.  On question 10, Doe wrote a "D" in the margin of his examination booklet; Student B wrote a large "C" in his margin; both Doe and Student B marked "C" on their Scantron® answer

---

[14]  Copies of the Biology 120 examination booklets were not attached to the faculty report of academic integrity violation and not otherwise made part of the administrative record.

Doe attempted to augment the administrative record in the superior court with the booklets from two midterm examinations in Biology 220 to establish the veracity of his statement that he normally wrote letters in the margins of multiple choice tests.  Although Doe contends to the contrary, the superior court ultimately sustained USC's objection to the requested augmentation.  In any event, as the court noted at the January 4, 2017 hearing before finally ruling on USC's objection, there were many fewer letters in the margins of those two tests than in Doe's final examination booklet and a number of those were smaller and less distinct than the handwritten letters at issue in this case.

sheets. Doe wrote two letters in the margins of five additional questions (for example "A/B" for question 14); Student B marked one of those two letters as his answer to four of those questions (all but number 40, which was one of the four questions as to which Doe and Student B provided different answers). Of the 16 questions for which Doe did not write any letter in the margins of the examination booklet, Student B wrote an answer for 14. Doe marked 12 of his answers to those 14 questions with the letter Student B placed in the margins of his booklet. Neither student wrote in the margin of questions 18 and 26. However, on question18 Student B circled "C" in his booklet; both Doe and Student B marked "C" on their answer sheets. Both students marked "D" as their answer to question 26. Significantly, for at least six questions Doe and Student B marked the same *incorrect* answer.[15] Although this pattern of cross-identity of proposed and actual answers between Doe and Student B might have been the product of independent work, SJACS's conclusion it was the result of cheating is a reasonable inference, solidly grounded in the record.

In contrast, the superior court's observation that Doe's and Student B's marginal notes differed on 44 percent of the questions—the sole basis for its conclusion SJACS's decision was not supported by substantial evidence and a point repeated by Doe on appeal—is of minimal probative value. In fact, Doe and Student B wrote different letters in the margins of their

---

[15] Although the answer key is not part of the administrative record, their test scores equate to eight incorrect answers for Doe and 10 incorrect answers for Student B. Because 46 of their 50 answers were identical, Doe and Student B necessarily marked the same incorrect answers on six or seven questions.

examination booklets in only two instances, questions 10 and 40 (that is, 4 percent of the time, not 44 percent).  As to the other 20 questions included in the court's calculation, either one student wrote an answer while the other left the margin blank, or one student wrote two letters, while the other wrote one of those same two letters in the examination booklet margins.  And they marked identical answers for all but three of those questions, a result that does nothing to belie the conclusion they were improperly sharing information during the examination.

Neither of Doe's other challenges to the evidence in the administrative record undermines the sufficiency of that evidence to support SJACS's decision.  (See *Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 431 [applying deferential substantial evidence standard of review, court will uphold an administrative decision if there is substantial evidence to support it whether or not that evidence is contradicted]; *California Oaks Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 247 ["[w]here a petitioner's challenge in a mandamus action rests on the sufficiency of the evidence, 'the court does not have the power to judge the intrinsic value of the evidence or to weigh it'"].)

First, Doe points out that the redacted copy of Doe's examination booklet in the administrative record has two different page 9's, containing questions 34 through 39:  On one version the page number is visible, and a large "C" is written next to question 36.  In the second version there is no page number; at the bottom of the page there is the legend, "Figure 3 Example page from [John Doe's] exam"; and the margin next to question 36 is blank.  In addition, the redactions on the two pages, apparently made by a dark marker pen, are slightly

17

different; and the handwritten letters in the margins next to questions 34 and 38 are not identical.

Doe posits that at least one of these two pages is not an actual photocopy of his examination booklet, but a "re-creation." While not suggesting this necessarily demonstrates improper action by USC officials, Doe argues the unexplained presence of a false copy calls into question the authenticity of all the pages of the examination booklet and, as a consequence, the reliability of SJACS's finding that cheating occurred, which was largely based on inferences from the margin notations in Doe's and Student B's examination booklets and their bubbled answers on the Scantron® answer sheets.

The existence of two nonidentical versions of the same page from Doe's examination booklet is troubling. Because this issue was not raised during the administrative proceedings or in the superior court, however, USC did not have an opportunity to address it; and it would normally be deemed forfeited. (See, e.g., *Rand v. Board of Psychology* (2012) 206 Cal.App.4th 565, 587 [issue not raised in administrative proceedings or in the trial court deemed forfeited]; *Owen v. Sands* (2009) 176 Cal.App.4th 985, 995 [same].)[16] In any event, Doe does not dispute he wrote large letters in the margin next to most, but not all, of the questions in his examination booklet. Nor does he contend those handwritten letters were not visible to Student B, who was sitting next to him. Moreover, whether Doe wrote a "C" next to question 36 or left that margin blank has no real significance for

---

[16] Although USC was responsible for preparing the administrative record, it was provided directly to Doe's counsel, who added several documents before lodging it with the superior court.

18

the statistical analysis at the heart of this case because question 36 was one of the four questions Doe and Student B answered differently.[17]

Next, Doe argues certain evidence that would generally be expected in an academic cheating case was apparently not considered during the university's disciplinary proceedings. As Doe notes, there was no explanation as to how Doe and Student B, while seated next to each other, ended up with the same version of the examination. In addition, there was no testimony from any of the six proctors who were present in the examination room or from any of the students seated near Doe and Student B that indicates they were seen copying from each other or otherwise engaged in suspicious behavior while taking the test. Those evidentiary gaps, Doe contends, justify the conclusion the administrative record is insufficient to support SJACS's decision to impose sanctions on Doe.

There is no question that evidence from proctors or fellow students concerning distribution of the examination booklets or Doe and Student B's behavior in the examination room would have been material, either to support or contradict the allegation of cheating. But the absence of that information does not detract from the reasonableness of the inferences by the SJACS review officer based on the evidence that was presented to him, including the statistical analysis of Doe's and Student B's

---

[17]    Student B wrote "A/C" in the margin next to question 36. He then bubbled "C" on the Scantron® answer sheet; Doe bubbled "A." The comparison sheet in the initial faculty report has "C?" next to question 36 in the column indicating Doe's margin notes. Apparently unaware of the second version of this page, the superior court wrote Doe had "C" next to question 36.

19

answers, the fact they had the same version of the examination while sitting next to each other and their use of large letter proposed answers in the margins of the examination booklets.

Finally, conceding the evidence may well be sufficient to conclude that Student B copied the answers Doe had marked in the margins of the examination booklet,[18] Doe contends the finding he intentionally facilitated Student B's cheating is purely speculative. Doe's protestation of his noninvolvement in the cheating that took place, however, was belied by his denial that he and Student B had studied together for the examination, which Student B refuted. The SJACS review officer was charged with the responsibility to determine Doe's credibility and, having done so, to weigh all the evidence. (See *Doe v. Regents of University of California*, *supra*, 5 Cal.App.5th at p. 1073.) The determination Doe and Student B collaborated to share answers during the Biology 220 final examination is "one which could have been made by reasonable people." (*Ibid.* [internal quotation marks omitted].)

3. *Doe Was Not Deprived of His Right to a Fair Hearing*

Doe urges us to affirm the superior court's order granting his petition for writ of administrative mandamus even if the administrative record supports the finding of academic dishonesty because the decisionmaking process used in this case violated USC's own procedural rules and was fundamentally

---

[18] In his written submission to the Student Behavior Appeals Panel, Doe acknowledged he had "made the mistake of letting my guard down in not protecting my exam and scantron as well as I normally would."

unfair.[19]  (See *Doe v. University of Southern California, supra,* 246 Cal.App.4th at pp. 245-246 [student disciplinary process should at least provide the student the names of the witnesses against him, an oral or written description of the facts as reported by those witnesses and an opportunity to respond and characterize his or her conduct and put it in its proper context]; see also *Doe v. Regents of University of California, supra,* 5 Cal.App.5th at p. 1077 [fair procedure generally requires notice reasonably calculated to apprise interested parties of the nature of the charges and an opportunity to respond to them]; see

[19]   USC anticipated Doe's argument concerning procedural unfairness and asserted in the final section of its opening brief that Doe could not establish he had been denied a fair hearing. In its reply brief, however, USC contends, because Doe did not file a cross-appeal from the superior court's judgment, that issue is not properly before us.  USC's belated forfeiture argument overlooks section 906, which expressly authorizes a respondent, without appealing from the judgment, to assert grounds rejected by the trial court that compel affirmance of the judgment in its favor.  (§ 906 ["respondent, or party in whose favor the judgment was given, may, without appealing from such judgment, request the reviewing court to and it may review any [order or decision that involves the merits or necessarily affects the judgment] for the purpose of determining whether or not appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken"]; see *Mayer v. C.W. Driver* (2002) 98 Cal.App.4th 48, 57 [respondent permitted by section 906 to raise argument without cross-appeal that trial court reached right result "even if on the wrong theory"]; *California State Employees' Assn. v. State Personnel Bd.* (1986) 178 Cal.App.3d 372, 382, fn. 7 [section 906 "allow[s] a respondent to assert a legal theory which may result in affirmance of the judgment"].)

21

generally *Goss v. Lopez* (1975) 419 U.S. 565, 579-580 [95 S.Ct. 729, 42 L.Ed.2d 725] ["[a]t the very minimum, therefore, students facing suspension . . . must be given *some* kind of notice and afforded *some* kind of hearing"].)  Specifically, Doe argues USC failed to timely provide him with his and Student B's examination booklets with lettering in the margins, the key evidence used against him, and chilled his right to gather from witnesses information relevant to the cheating charge.  Neither of Doe's contention has merit.

Shortly after the academic integrity review process began, Doe was provided a copy of the faculty report sent to SJACS that triggered the formal proceedings.  The report emphasized the statistically improbable correlation between Doe's and Student B's answers, discussed the fact they had the same version of the examination while seated next to each other and analyzed the relationship between the proposed answers written in the margins of their examination booklets and the Scantron® answer sheets—that is, the report explained the basis for the charge of cheating, the evidence supporting the charge, and the identity of the professors who had initiated the complaint.  Doe was given a summary of the review process that would be followed, referred to the portion of the student handbook that detailed the entire process and told he had a right to inspect, but not copy, the examination papers.  Doe exercised his right to review the examination papers.  This procedure complied with USC's rules governing the review process[20] and satisfied the

_____

[20]    Section 10.30 of USC's Student Conduct Code, Student Procedural Protections, provides, among other safeguards for a fair hearing, the right to "[w]ritten notice via email of the incident report that specifies the nature of the alleged violation

22

rudimentary requirements for a fair hearing. (See *Doe v. University of Southern California*, *supra*, 246 Cal.App.4th at p. 240 [student facing suspension must be given, at a minimum, an opportunity to explain his or her version of the facts after first being informed of the accusation of misconduct and the basis for it].)

In addition, although Doe complains he was not allowed to inspect both sets of examination papers until late in the review process (two months after the complaint was initiated and only a few days before the SJACS review officer issued his decision), he was invited to schedule an appointment to review those documents more than a month earlier, on July 1, 2015, the same day he met with the review officer.[21]  Moreover, Doe does not indicate how his delay in reviewing the examination papers prejudiced his case.  To the contrary, Doe never argued that the analysis of the relationship between the handwritten letters in the margins of the examination booklets and the Scantron® answer sheets was flawed or disputed that this evidence convincingly demonstrated Student B had cheated.  Rather, he

---

and the basis for the charge including the date or period of time and location regarding the alleged incident";"[t]he right to inspect documents and/or relevant information on file prior to the review"; "[t]he opportunity to be present at the review; to inspect all evidence presented; and to present witnesses and evidence"; and the right to "[a] fair and impartial review of the incident" with "a written decision outlining the results of the review . . . includ[ing] the factual basis for the conclusions drawn."

[21]     The invitation to schedule an appointment to inspect the examination papers was repeated in an email sent to Doe on July 15, 2015.

challenges only the additional finding that he cooperated with Student B in the cheating scheme, an inference based primarily on evidence relating to his credibility, not the information gleaned from the examination booklets and answer sheets. (Cf. *Doe v. Regents of University of California*, *supra*, 5 Cal.App.5th at pp. 1085-1093 [court analyzes whether restrictions on cross-examination of sexual assault victim "rendered the hearing unfair by prejudicing" the alleged perpetrator].)

Doe's second complaint of procedural unfairness—that USC severely compromised his ability to gather evidence to defend against the charge of cheating—is based on the review officer's admonition when sending Doe a copy of the faculty report not to engage in inappropriate contact with the reporting individuals or other witnesses.[22] Although Doe contends this warning deterred him from interviewing Student B, the examination proctors and other students sitting near him during the examination, cautioning Doe to refrain from improper tactics when speaking to potential witnesses did not preclude him from reaching out to any

---

[22] The review officer's email stated, "Per your request, I have attached a copy of the [faculty] report for your review. Please note that documents may include names of reporting individuals and witnesses. Receipt of this email and included documents means that you understand that inappropriate contact with these individuals may be deemed as intimidation or retaliation, a violation of the Student Conduct Code (11.55)." Section 11.55 of the USC Student Conduct Code, which had been made available to Doe, prohibits, in part, "[t]hreatening, attempting, or committing retaliation against anyone who, in good faith, brings a complaint under the Student Handbook policy, university policy, or applicable law; or participates in investigation of such a complaint . . . ."

of those individuals or to have one of his parents, who assisted him during this process, or a lawyer do so. The decision to refrain from appropriate contact with potential witnesses was Doe's alone.[23]

In addition, as USC points out, this argument was not presented during Doe's administrative appeal and was only identified in passing in the superior court, as part of Doe's contention that USC had improperly imposed on him the burden to prove his innocence—a claim of procedural unfairness that has not been raised on appeal. Accordingly, independent of its lack of merit, the issue whether the review officer's warning improperly chilled Doe's ability to contact potential witnesses has been forfeited. (See *NBS Imaging Systems, Inc. v. State Bd. of Control* (1997) 60 Cal.App.4th 328, 336-337 [review of administrative proceedings is confined to the administrative record]; *Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1197 [failure to raise a defense before the administrative body waives the defense]; *City of Walnut Creek v. County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1019-1020 [a party must present all legitimate issues before the administrative tribunal].)

---

[23] The review officer's notes indicate Doe had communicated with Student B prior to the July 1, 2015 meeting between Doe and the review officer. In a telephone call following the July 1 meeting, the review officer advised Doe against any further contact with Student B in response to Doe's suggestion he could prove his innocence by obtaining a confession from Student B.

4. *The Consequences of Our Reversal of the Superior Court's Judgment Are Appropriately Determined by USC in the First Instance*

Because Doe graduated and received his degree while USC's appeal was pending, we invited the parties to submit supplemental letter briefs addressing whether his graduation mooted the appeal and, if not, what effect it might have on possible academic sanctions that would be available to USC if we were to reverse the superior court's judgment granting the petition for writ of administrative mandamus.

USC responded that Doe's graduation does not moot the case, in whole or in part. Upon reversal, USC asserted, Doe's grade in Biology 220 will be changed to an "F"; his diploma will be invalidated because passing Biology 220 is a requirement for Doe's major; and the two-semester suspension will be imposed, preventing Doe from enrolling in courses at USC during that period.[24] USC emphasized that in his reply brief in support of his petition for writ of supersedeas, Doe had argued, "Granting this petition would not in any way deprive USC of appellate remedies to which it could be entitled were it to prevail. . . . USC would—if successful on appeal—be able to rescind or modify whatever academic recognition it confers . . . ."

---

[24] While insisting Doe must retake and earn a passing grade in Biology 220 if the judgment granting the writ of administrative mandamus is reversed, USC's supplemental brief confirms, "Doe may retain credits he earned since the administrative proceeding during which the suspension was stayed by order of the trial court and this Court's writ of supersedeas."

26

In his supplemental brief Doe acknowledged that passing Biology 220 was required for his degree in Human Biology and that, in general, USC has the power to revoke a degree. Nonetheless, Doe contends the appeal is now moot, arguing that, following the filing of its notice of appeal and before the May 12, 2017 graduation ceremony, USC could have asked this court for discretionary relief under section 1094.5, subdivision (g), to keep the disciplinary measures in place while the appeal was pending. USC's failure to do so, Doe insists, "was surely a waiver." Moreover, Doe argues, revoking the degree USC conferred in May 2017 would impose an increased and harsher sanction than initially ordered by the university, in effect an impermissible punishment for having challenged the university's disciplinary process in court.

Determining the ultimate effect of our reversal of the superior court's judgment, including whether Doe's degree should be rescinded or the two-semester suspension imposed nearly three years after it was ordered, are matters properly entrusted to USC in the first instance. (See generally *Paulsen v. Golden Gate University* (1979) 25 Cal.3d 803, 808 [courts will not intervene in the academic affairs of schools unless the school acted arbitrarily or in bad faith]; *Lachtman v. Regents of University of California* (2007) 158 Cal.App.4th 187, 203 [""[u]niversity faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation""].) Accordingly, although we raised the issue with our invitation for supplemental briefing, we decline to resolve it at this time.

## DISPOSITION

The judgment is reversed and the cause remanded with directions to deny John Doe's petition for writ of administrative mandamus.  USC is to recover its costs on appeal.


PERLUSS, P. J.


We concur:


ZELON, J.


WILEY, J.[*]

---

[*]     Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JOHN DOE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA, et al.,<br><br>　　Defendants and Appellants. | B281961<br><br>(Los Angeles County<br>Super. Ct. No. BS159753)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING, CERTIFYING OPINION FOR PUBLICATION (NO CHANGE IN JUDGMENT) |

THE COURT:

It is ordered that the opinion filed herein on September 19, 2018 be modified as follows:

1. At the top of page 25, after the sentence ending "who assisted him during this process, or a lawyer do so." add as footnote 23 the following footnote, which will require renumbering of all subsequent footnotes:

> [23] *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, decided by our colleagues in Division One of this court shortly before oral argument in this case, does not suggest, as Doe has argued, that USC's academic integrity review process was fundamentally unfair because Doe was not permitted to question Student B before the SJACS review officer. Rather, in the context of a sexual misconduct case where the school's determination turned on the complaining witness's

credibility, the court held, "the accused student is entitled to 'a process by which the respondent may question, if even indirectly, the complainant.'" (*Id.* at p. 1070.) Student B was not the complaining witness, but Doe's coconspirator in the cheating scheme.

2. There is no change in the judgment.

3. John Doe's petition for rehearing is denied.

The opinion in the above-entitled matter filed on September 19, 2018 was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

PERLUSS, P. J.          ZELON, J.          WILEY, J.[*]

_____

[*]     Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.