Filed 4/15/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF SOCIAL SERVICES,<br><br>    Appellant,<br><br>v.<br><br>DAVID MARIN,<br><br>    Respondent. | 2d Civ. No. B287769<br>(Super. Ct. No. 16CV01163)<br>(Santa Barbara County) |

California's adoption assistance program (AAP) provides financial support to families to facilitate the adoption of special needs children who would otherwise remain in long-term foster care. AAP monthly payments are negotiated between the adoptive parents and the responsible public agency, but are limited to the applicable basic foster care maintenance payment rate. (Welf. & Inst. Code, § 16119, subd. (d)(1);[1] Cal. Code Regs., tit. 22, § 35333.) California's foster care maintenance program requires that foster parents be reimbursed for certain costs

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

enumerated by statute. (§ 11460, subd. (b); 42 U.S.C. § 675(4)(A).)

The United States Court of Appeals for the Ninth Circuit (Ninth Circuit) upheld a district court's determination that the amount the California Department of Social Services (CDSS) pays for foster care maintenance violates federal law because it does not cover the statutorily enumerated costs. (*California State Foster Parent Assn. v. Wagner* (9th Cir. 2010) 624 F.3d 974, 978 (*Wagner*).) The district court enforced this decision by ordering CDSS "to implement [its] new method for determining the rates of payments to foster parents that includes consideration of the cost factors." (*California State Foster Parent Assn. v. Lightbourne* (N.D. Cal., May 27, 2011, No. C 07-05086 WHA) 2011 U.S.Dist. Lexis 57483, *8 (*Lightbourne*).)

David Marin, who admirably adopted three special needs children in 2005, requested an increase in the family's AAP payments based upon *Wagner*. After his administrative claim was denied, Marin petitioned for a writ of mandate, which the trial court granted. It ordered that the matter be remanded to the CDSS State Hearing Division for an evidentiary hearing to assess whether the costs and expenses Marin has incurred in raising his three children exceed the AAP payments received from CDSS. If so, the court directed CDSS to augment those payments from October 21, 2008 to the present.

CDSS asserts, and we agree, that the foster care maintenance payment rate increases mandated by *Wagner* and *Lightbourne* do not apply retroactively to Marin's adopted children. The California Legislature specifically amended section 16121 to confirm that initial adoption assistance agreements that

2

predate *Lightbourne* are not subject to the new rate structure. We reverse the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Following the children's adoptions, CDSS provided Marin's family with AAP benefits. Marin executed the initial adoption assistance agreements in December 2004. The agreements reflect the amounts and duration of the negotiated benefit and are effective until terminated or until a new amended agreement is signed. Per regulations, the County of Santa Barbara (County), which is the local AAP administrator, utilizes the basic age-related foster care maintenance payment rates to set the monthly AAP payment for each child. Thus, the County offered, and Marin accepted, the maximum age-related, state-approved foster care maintenance payment rate for each child. Over the years, the family has received rate increases pursuant to regulations and the children's ages.

In 2007, the California Legislature passed, and the Governor approved, Senate Bill No. 84 (SB 84). (See SB 84 (2007-2008 Reg. Sess.), § 37.) SB 84 added section 16121.01, which provided: "Notwithstanding any other provision of law, the amount of aid to be paid to an adoptive family for any adoption assistance agreement executed prior to October 1, 1992, or the foster care maintenance payment based on the age-related, state-approved foster family home care rate and any applicable specialized care increment that would have been paid to an adoptive family for an adoption assistance agreement executed prior to January 1, 2008, shall not be adjusted pursuant to the rate increase specified in subparagraph (C) of paragraph (1) of subdivision (d) of Section 11461 in any subsequent reassessment on or after January 1, 2008." In other words, a child who was

3

receiving AAP benefits under an initial adoption assistance agreement executed prior to January 1, 2008 was not entitled to a rate adjustment to reflect the rate increases provided to foster parents pursuant to SB 84.

In 2014, Marin learned of the *Wagner* decision, which ultimately resulted in an increase in the foster care maintenance payment rate structure. Citing *Wagner*, Marin requested that the County increase the family's monthly AAP payments beginning October 21, 2008, which is when the district court first determined that CDSS had been setting foster care maintenance payment rates without considering statutorily mandated cost reimbursement requirements. (See *Wagner*, *supra*, 624 F.3d at p. 977; *Lightbourne, supra*, 2011 U.S.Dist. Lexis 57483, at pp. *2-3.) Marin specifically sought reimbursement for "clothing," "tutoring," "SAT/ACT preparation," "college," "general cost of living" and anything else "not related to physical or developmental disability."

After the County rejected his request, Marin sought and received a hearing before the CDSS State Hearing Division. The assigned administrative law judge (ALJ) denied Marin's claims, finding that the County correctly determined the AAP payment rate for each child is "in accordance with the State of California AAP rules and regulations." The ALJ recognized that "[f]or initial AAP agreements entered into on or after October 1, 1992 through December 31, 2007, and the adoption was finalized before May 27, 2011, the age-related basic [foster care maintenance payment] rates in effect December 31, 2007 are used."

The trial court granted Marin's petition for writ of mandate challenging the ALJ's decision. The court acknowledged that

4

*Wagner* did not discuss AAP payments, but found that since "the *Wagner* court concluded that foster care benefits paid by [CDSS] were insufficient to pay for items necessary to raise children, it follows that the same payments under [CDSS's] adoption assistance program are also deficient." The court noted "[i]t makes little sense legally to pay adoptive parents less than foster parents when the express goal of the [AAP] is to remove the financial disincentive for foster families to adopt."

The trial court ordered that the matter be remanded to the ALJ for an evidentiary hearing "to determine whether, in raising his three children, [Marin] incurred costs and expenses in excess of the payments he received from [CDSS]." Assuming Marin did incur such costs and expenses, the court directed CDSS to "augment his payments from October 21, 2008 to the present, in an amount consistent with *Wagner*." CDSS appeals.

## DISCUSSION

### *Standard of Review*

"On appeal from the judgment on a petition for writ of administrative mandate in a case not involving fundamental vested rights, as here, we review the agency's findings, not the superior court's decision, for substantial evidence." (*Doe v. University of Southern California* (2018) 28 Cal.App.5th 26, 34; see Code Civ. Proc., § 1094.5, subd. (c) ["abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record"].) "However, insofar as an appeal from an administrative mandamus proceeding presents questions of law, our review is de novo." (*Telish v. State Personnel Bd.* (2015) 234 Cal.App.4th 1479, 1487; *Young v. California Fish and Game Com.* (2018) 24 Cal.App.5th 1178, 1192.) In this regard, an administrative

5

agency's interpretation of its governing regulations – such as CDSS's interpretation of AAP statutes and regulations – is entitled to "great weight and deference." (*Calderon v. Anderson* (1996) 45 Cal.App.4th 607, 612-613.)

*Statutory and Regulatory Framework*

CDSS provides adoption assistance and foster care maintenance payments pursuant to federal funding authorized by the Adoption Assistance and Child Welfare Act of 1980 (CWA). (42 U.S.C. § 670 et seq.) The CWA specifies certain requirements for both foster care maintenance payments (*id.* § 672) and adoption assistance payments (*id.* § 673). The purpose of the latter program is to create incentives to encourage the adoption of special needs children. (See *id.* § 670.) Accordingly, a state with an approved AAP "shall enter into adoption assistance agreements . . . with the adoptive parents of children with special needs." (*Id.* § 673(a)(1)(A).) "The amount of the [adoption assistance] payments . . . shall be determined through agreement between the adoptive parents and the State . . . , which shall take into consideration the circumstances of the adopting parents and the needs of the child being adopted, and may be readjusted periodically, with the concurrence of the adopting parents . . . , depending upon changes in such circumstances. However, in no case may the amount of the adoption assistance payment . . . exceed the foster care maintenance payment which would have been paid during the period if the child with respect to whom the adoption assistance payment is made had been in a foster family home." (*Id.* § 673(a)(3).)

Consistent with the CWA, California's federally approved AAP "removes or reduces barriers to the adoption of children who otherwise would remain in long-term foster care. The program

6

provides necessary financial assistance to families who are willing and able to assume parental responsibility for [such] children but are prevented from doing so by inadequate financial resources." (Cal. Code Regs., tit. 22, § 35325, subd. (a).) The AAP benefit is "a negotiated amount based upon the needs of the child and the circumstances of the family." (§ 16119, subd. (d)(1); Cal. Code Regs., tit. 22, § 35333.) There is no "means test used to determine an adoptive family's eligibility for the [AAP], or the amount of adoption assistance payments." (§ 16119, subd. (d)(1).) Rather, the responsible public agency must advise the adoptive parents that the AAP benefit is limited to the age-related, state-approved foster care maintenance rate and that the benefit "does not include payment for any specific good or service, but is intended to assist the adoptive parents in meeting the child's needs." (Cal. Code Regs., tit. 22, § 35333, subds. (a)(3), (a)(5).)

Although the CWA does not contemplate reimbursement of certain enumerated costs and expenses incurred by AAP families, both federal and California law require that foster care maintenance payments "cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement." (42 U.S.C. § 675(4)(A); § 11460, subd. (b).) But these statutes do not direct the responsible public agency to reimburse foster parents for the actual costs incurred in providing the specified items. Rather, because the CWA defines "foster care maintenance payments" to mean payments that cover the cost of these items, the CWA requires states to consider their costs when

7

setting rates. As explained in *Missouri Child Care Assn. v. Martin* (W.D. Mo. 2003) 241 F.Supp.2d 1032, the CWA's "list of factors is . . . sufficiently detailed to put the State on notice and to permit a court to review whether the State has based its reimbursement on those statutory criteria. . . . ¶ . . . At a minimum, the State is obligated to have a process for determining rates that takes into account the statutory criteria mandated by the CWA." (*Id.* at pp. 1044-1045.)

*Substantial Evidence and Applicable Law*
*Support the ALJ's Decision*

CDSS contends the trial court erred by granting Marin's petition for writ of mandate. It claims the court incorrectly determined that Marin is entitled to recover the actual costs and expenses associated with raising his three adopted children. Marin maintains that *Wagner* supports the court's decision and undermines the ALJ's findings. As we shall explain, Marin has not demonstrated that the new foster care maintenance payment rate structure implemented in response to *Wagner* and *Lightbourne* should result in a retroactive increase in his family's AAP payments.

In *Wagner*, the plaintiffs, a group of non-profit organizations representing California foster parents, claimed that the state's foster care maintenance payment rates violate the requirements of the CWA and its implementing regulations. (*Wagner*, *supra*, 624 F.3d at pp. 976-977.) They noted that when determining its foster care maintenance payment rates, CDSS does not consider the actual cost of providing the items enumerated in 42 United States Code section 675(4)(A). The district court concurred, "finding that the CWA created a federal monetary entitlement and that the State violated the Act by

8

setting rates without considering the CWA's mandatory cost factors." (*Wagner, supra*, 624 F.3d at p. 977.) The court granted the plaintiffs' motion for summary judgment. (*Ibid.*)

The Ninth Circuit affirmed, noting that the CWA creates "a program through which the federal government provides funding to states to cover the costs of administering the foster care system," and "requires that participating states use the federal funds to reimburse foster parents for identified out-of-pocket costs." (*Wagner*, *supra*, 624 F.3d at pp. 977-978.) It agreed with the district court that the CWA "establish[es] a presumptively enforceable right under [42 United States Code section] 1983 to foster care maintenance payments from the State that cover the cost of the expenses enumerated in [42 United States Code section] 675(4)(A)," and that the plaintiffs are entitled to seek "redress for inadequate maintenance payments." (*Id.* at p. 982.)

Both Marin and the trial court overstate *Wagner's* holding. The Ninth Circuit did not broadly conclude that "foster care benefits paid by [CDSS] were insufficient to pay for items necessary to raise children." It determined the then-existing foster care maintenance payment rate structure did not take into account the costs enumerated in the CWA, and contemplated that CDSS would adjust its rate structure to include those specific costs. (*Wagner*, *supra*, 624 F.2d at pp. 977-978.) When CDSS failed to do so, the plaintiffs sought enforcement in the district court. (*Lightbourne*, *supra*, 2011 U.S.Dist. Lexis 57483, at pp. *2-9.)

The district court noted that California had "commissioned a study concerning the method by which it should begin setting rates that take into account the cost factors under the CWA." (*Lightbourne*, *supra*, 2011 U.S.Dist. Lexis 57483, at p. *3.) After

9

the study was finished, CDSS developed a new rate methodology for foster care maintenance payments, which resulted in rate increases.  (*Ibid*.)  But CDSS did not implement this new methodology.  Finding that CDSS had received a full and fair opportunity to comply with federal law, the court ordered CDSS "to implement [the] new rate structure immediately," starting with the next round of foster care maintenance payment checks.  (*Id.* at pp. *4-5.)  CDSS complied with this directive.

*Lightbourne* did not order CDSS to issue retroactive payments to foster parents.  Indeed, the plaintiffs did not request such relief.  Instead, the district court ordered CDSS to "implement the rate methodology and specific rates described in the . . . submission dated April 8, 2011 (Dkt. No. 166), effective immediately." (*Lightbourne, supra*, 2011 U.S.Dist. Lexis 57483, at p. *9.)  The new foster care maintenance payment rate structure, which is outlined in *Lightbourne,* is codified in section 11461, subdivision (g)(1).[2]

In response to *Lightbourne*, the California Legislature amended section 16121 to recognize the new foster care maintenance payment rate structure.  (See Assem. Bill No. 106 (2011-2012 Reg. Sess.), § 67 (AB 106).)  It added section 16121, subdivision (a)(4), which allows the maximum eligible AAP payment rate to equal the new foster care maintenance payment rate established pursuant to *Lightbourne* if (1) the initial adoption assistance agreement was executed on or after July 1,

---

[2] The new rate structure allows for monthly payments of $609 for children up to four years old, $660 for children aged 5 to 8, $695 for children aged 9 to 11, $727 for children aged 12 to 14, and $761 for persons aged 15 to 20.  (§ 11461, subd. (g)(1); *Lightbourne, supra*, 2011 U.S.Dist. Lexis 57483, at p. *9.)

2011 or after the final order was issued in *Lightbourne*, whichever is earlier, or (2) the initial adoption assistance agreement was executed before July 1, 2011, or the date specified in the final order, whichever is earlier, and the adoption is finalized on or after the earlier of July 1, 2011, or that specified date.

Notably, the amended version of section 16121 reiterates, consistent with former section 16121.01,[3] that for initial adoption assistance agreements executed between October 1, 1992 and December 31, 2007, the adoptive family will continue to be paid an amount based on the child's needs and the adoptive parents' circumstances so long as it does not exceed "the basic foster care maintenance payment rate structure in effect on December 31, 2007." (§ 16121, subd. (a)(1).) Section 16121 also provides that for initial adoption assistance agreements executed between January 1, 2008 and December 31, 2009, the AAP payment shall not exceed the basic foster care maintenance payment rate structure in effect on December 31, 2009, and that for initial adoption assistance agreements executed between January 1, 2010 and June 30, 2011, the AAP payment shall not exceed the basic foster care maintenance payment rate structure in effect on June 30, 2011. (*Id.*, subds. (a)(2), (a)(3).) Hence, by limiting application of the new rate structure to initial adoption assistance agreements executed on or after July 1, 2011, the Legislature expressly chose not to apply *Lightbourne* retroactively. Marin nonetheless maintains he is entitled to retroactive relief.

---

[3] AB 106 repealed section 16121.01. (AB 106 (2011-2012 Reg. Sess.), § 68.)

11

*Schettler v. County of Santa Clara* (1977) 74 Cal.App.3d 990 (*Schettler*) is instructive. The appellant in that case brought an action to recover ad valorem property taxes on imported goods he owned in 1972. At that time, the law provided that such goods were immune from local taxation. (*Id.* at p. 995.) The United States Supreme Court reversed that law in *Michelin Tire Corp. v. Wages* (1976) 423 U.S. 276 [46 L.Ed.2d 495] (*Michelin*). (*Schettler,* at p. 995.)

The California State Board of Equalization applied *Michelin* retroactively, ordering county assessors to levy ad valorem property taxes for prior years. (*Schettler*, *supra*, 74 Cal.App.3d at pp. 995-996.) Concerned about the economic impact of *Michelin's* retroactive application, the California Legislature enacted a statute that provided for prospective application only. (*Id.* at p. 996.) An issue on appeal was "whether the Legislature was authorized to provide for the prospective application of *Michelin.*" (*Id.* at p. 997.)

*Schettler* acknowledged the general rule that "the California Constitution permits an appellate court to restrict an overruling decision [to] prospective application if fairness and equity are served thereby, even though the prospective application of the decision temporarily preserves a mistaken interpretation of the law. [Citations.] Even more to the point, the California case law [holds] that the Legislature, as well as the court, is competent to define the retroactive scope of an overruling decision." (*Schettler*, *supra*, 74 Cal.App.3d at pp. 997-998; accord *Forster Shipbuilding Co. v. County of Los Angeles* (1960) 54 Cal.2d 450, 459 ["Such temporary application of the rule of an overruled case may be prescribed by appropriate legislation as well as by judicial decision, for the Legislature is no

12

less competent than the court to evaluate the hardships involved and decide whether considerations of fairness and public policy warrant the granting of relief"]; *Lewis v. City of Hayward* (1986) 177 Cal.App.3d 103, 115 ["*Schettler* . . . stand[s] for the proposition that the Legislature may limit an overruling judicial decision to prospective application to avoid unfairness"]; *Kawasaki Motors Corp. v. County of Orange* (1983) 146 Cal.App.3d 780, 783 ["The California Legislature is . . . competent to define the retroactive scope of an overruling decision"].)

Applying this rule, *Schettler* concluded the Legislature properly availed itself of its legal authority to determine that *Michelin* should not be applied retroactively. (*Schettler*, *supra*, 74 Cal.App.3d at p. 999.) The court explained: "The cases uniformly hold that the courts should give due weight and deference to legislative judgment; and where, as here, the findings of the Legislature have a reasonable basis, the question of what constitutes a legitimate public purpose or public policy is largely one for the Legislature which may not be second-guessed, much less disturbed by the reviewing court." (*Ibid.*)

Here, the California Legislature decided that CDSS's new foster care maintenance payment rate structure should not be applied retroactively to AAP payment recipients. AB 106 confirms the Legislature's intent to apply the new rate structure prospectively only: "This bill, *with respect to agreements on or after July 1, 2011*, would revise Kin-GAP, AFDC-FC, and AAP rates, as prescribed, and would annually adjust these rates by the percentage changes in the California Necessities Index, and make related changes. The bill would authorize implementation of these provisions through all-county letters or similar instructions from the department until regulations are adopted, as specified."

13

(AB 106 (2011-2012 Reg. Sess.), italics added.)  The bill also appropriated monies from the General Fund to finance the rate adjustments.  (*Ibid.*)

It bears emphasis that neither *Wagner* nor *Lightbourne* anticipated retroactive application of their holdings.  *Wagner* held that the foster care maintenance payment rate structure did not comply with federal law, and *Lightbourne* enforced *Wagner* by requiring CDSS to *immediately* implement a new foster care maintenance payment rate structure in compliance with federal law.  That was in 2011.  There was no suggestion that prior foster care maintenance payments must be similarly adjusted, let alone that California's AAP would be affected beginning in 2008.  It is obvious that retroactive application of the new foster care maintenance payment rate structure to both foster care payment recipients and adoption assistance payment recipients would be difficult to implement and have a significant fiscal impact.  But the Legislature did not have to consider this impact because *Lightbourne* did not require it.  It only directed CDSS to implement the new foster care maintenance payment rate structure with respect to future payments.  The Legislature appropriately enacted legislation in direct response to this holding.

Marin does not dispute that the County properly calculated his family's AAP payments based upon its understanding of the law.  His position is that he is entitled to a greater amount based upon *Wagner*.  Having rejected that argument, we conclude substantial evidence supports the ALJ's decision.  Nothing in *Wagner* suggests that Marin is entitled to the difference between the AAP funds he received and the actual costs and expenses he incurred in raising his three adopted children.

14

## DISPOSITION

The judgment granting the petition for writ of mandate is reversed, and the trial court is directed to enter a new judgment denying the petition.  CDSS shall recover its costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>


PERREN, J.


We concur:


YEGAN, Acting P.J.


TANGEMAN, J.

15

Donna D. Geck, Judge

Superior Court County of Santa Barbara

_____

Xavier Becerra, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General, Leslie P. McElroy and Tara L. Newman, Deputy Attorneys General, for Appellant.

Kelley Clarke, Matthew Clarke and Dugan Kelley, for Respondent.