Filed 6/26/24  Doe v. The Leland Stanford Junior University CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>THE LELAND STANFORD JUNIOR UNIVERSITY,<br><br>    Defendant and Respondent. | H050567<br>(Santa Clara County<br> Super. Ct. No. 21CV383878) |

John Doe, a staff researcher, and Jane Roe, a graduate student, worked together in the same lab at Stanford University.[1]  Jane reported to the professor supervising the lab that John had acted inappropriately toward her on several occasions, both in person and through written communications.  Stanford investigated Jane's allegations and found that John's conduct violated the university's code of conduct and the policy prohibiting sexual harassment.  John then unsuccessfully petitioned for writ of mandate to set aside Stanford's decision and the sanctions it imposed.

John now appeals from the trial court's denial of his petition and raises a series of procedural and substantive challenges to Stanford's decision.  As to procedure, John

---

[1] To protect the identities of the individuals involved in this case, we use the names "John Doe" and "Jane Roe," as did the parties in their briefing.  To avoid confusion, we will use John and Jane throughout the remainder of the opinion.  We will refer to Stanford University as Stanford, again following the parties' convention.

argues that Stanford did not provide him adequate notice of the charges or of Jane's allegations, and that the investigative process was unfair and deficient for several reasons. On substance, John argues that Stanford's decision was not supported by substantial evidence, that the factual and credibility findings were incorrect, and that the sanctions imposed were excessive.

We hold that Stanford's investigative process was not unfair for the reasons John posits. We also hold that substantial evidence supports the findings and decision that John violated university policies, and that the sanctions cannot be deemed excessive. We therefore affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Jane was a student from South Korea and was enrolled in Stanford's bioengineering graduate program. As part of her curriculum, Jane rotated through several labs to determine which lab she would join to conduct research. As of June 2019, Jane had officially joined one of the labs. John, who came to the United States from Iran, was a staff researcher in the same lab. His work entailed collecting data from experiments on animals for use in presentations and scholarly articles. Although John had no supervisory authority in the lab, he sometimes oriented new students and organized lab retreats.

### A. Report to Stanford's Title IX Office[2]

In September 2020, the lab's faculty director noticed that Jane seemed "down" and was not participating during a group meeting. The director texted Jane after the meeting and then had a one-on-one call with her. Jane disclosed during the call that after John provided her with data at the director's request, he asked Jane how she would "repay" him. Jane also disclosed that John asked to whisper in her ear and asked her for a hug.

---

[2] "Title IX refers to T]itle IX of the [F]ederal Education Amendments of 1972 [], 20 United States Code section 1681 et seq., which 'prohibits sex discrimination under any education program or activity receiving federal funds.' " (*Doe v. Regents of the Univ. of Cal.* (2022) 80 Cal.App.5th 282, 286.)

Jane read to the director some of the text messages John sent her that Jane considered inappropriate.

The lab director was not sure that John's behavior needed to be reported to Stanford's Title IX office, but she told Jane she would let the office handle it. She suggested to Jane that in the meantime, Jane should only communicate with John by email, should copy the director on their communications, and should block John's text messages. The director also changed the lab calendar so that John would not know Jane's schedule and excused Jane from attending social events at the lab.

On September 11, 2020, the lab director made a formal report to the Title IX office concerning Jane's allegations.

### B.     Investigation of Jane's Allegations

On October 9, 2020, Stanford sent a "Notice of Concern" letter to both Jane and John. The notice sent to John indicated that Stanford received a report that John had engaged in conduct that may violate Stanford's sexual harassment policy contained in Administrative Guide 1.7.1.[3] Specifically, the notice described the following allegations:

"• You engaged in inappropriate behavior toward the Complainant, including asking to whisper in the Complainant's ear, asking for a hug, and asking how she would 'repay' you after you provided her with research-related data;

"• You made inappropriate comments, including sending the Complainant unwanted and unprofessional text messages;

"• Your behavior persisted despite the Complainant asking you to stop."

---

[3] Under Administrative Guide 1.7.1, "[u]nwelcome sexual advances, requests for sexual favors, and other visual, verbal or physical conduct of a sexual nature constitute sexual harassment when: [¶] a. It is implicitly or explicitly suggested that submission to or rejection of the conduct will be a factor in academic or employment decisions or evaluations, or permission to participate in a University Activity (Quid Pro Quo), *OR* [¶] b. The conduct has a purpose or effect of unreasonably interfering with an individual's academic or work performance or creating an intimidating or hostile academic, work or student living environment (Hostile Environment)."

The notice also explained that because Jane was a graduate student and her allegations did not fall within the scope of the procedure applicable to Title IX investigations, Stanford would conduct its investigation using the SHARE investigation procedure.

The SHARE investigation procedure was created "to address sexual harassment and sexual violence involving reports against staff and postdoctoral scholars in which a student is reported to have experienced a Policy Violation." Under the procedure, the Deputy Title IX Coordinator for Staff and Postdoctoral Scholars or their designee serves as the initial decisionmaker to oversee the resolution of a report and the Vice President of Human Resources serves as the appeal officer. After an investigator is assigned and a Notice of Concern is sent to the parties, the complainant and respondent each "have an opportunity to respond to the Notice of Concern in writing and in a meeting with the investigator," and may "request that the investigator meet with relevant Witnesses and evaluate relevant documentary or other evidence." However, "[t]he investigator has broad discretion in determining whether an offered Witness or documentary evidence would be relevant or helpful to a determination."

At the conclusion of the investigation, the parties are provided a written "Notice of Outcome of Investigation," which includes "a determination as to whether the conduct as determined by the investigator(s) violated University policy and, if so, whether any remedial or corrective action will be taken." This notice is also provided "to those individuals at the University who have a need to know," including the respondent's supervisor, human resources manager, or dean.

Either party can appeal from the determination based on "new compelling evidence," "procedural irregularities that substantially affected the outcome," or by showing "the decision on the findings [is not] one a reasonable decisionmaker [would] have made." A written decision on the appeal is provided to both parties and is final.

4

On October 16, 2020, the investigators sent an email to Jane to set up an interview, which eventually occurred on November 30, 2020. The investigators interviewed John on December 4, 2020, and interviewed Jane for a second time on December 9, 2020. The investigators also interviewed several additional witnesses, including the lab director, another professor involved with the lab, and five other graduate students identified by Jane. Although given the opportunity, John did not identify any additional witnesses. In conjunction with the interviews, the investigators reviewed nearly 2,000 pages of documents submitted by Jane, John, the lab director, and two student witnesses. Most of these documents were printouts of text messages between Jane and John, and between Jane and the two student witnesses.

### C.    *Investigators' Findings and Recommendations*

On March 8, 2021, the investigators issued their findings and recommendations in a written report directed to Phung Truong, Stanford's Deputy Title IX Coordinator for Staff and Postdoctoral Scholars. In the report, the investigators described the evidence they received from the witness interviews and documents concerning several interactions between Jane and John in 2019 and 2020. We summarize the investigator's primary findings regarding some of these interactions below.

*August 19, 2019*: Jane rode with John to a weekend lab retreat at the lab director's house in Monterey. During the drive, the two discussed sleeping arrangements, and Jane told John it was going to be "weird" to share a room with the director. John responded by inviting Jane to sleep in his room with other male lab members, but Jane said she was more comfortable staying with women. John then asked Jane: "What's the matter? Don't you trust me?"

Although Jane sent several text messages to another student throughout the weekend describing the retreat, she did not mention sleeping arrangements or the conversation with John. Jane eventually mentioned the conversation with John in text

5

messages she sent to the same student seven to eight weeks later, and stated that John was a creep and that she hated him.

*August 21, 2019:* Jane received an unprompted text message from John consisting of only a kissing emoji. Minutes later, John sent another text message saying the first text was a mistake, along with "sorry" and two smiling emojis. Jane responded by writing: "Uhm LOL cool!" to which John wrote: "I feel like you liked it when you saw the emoji" and added a sunglasses emoji and a laughing emoji. Jane wrote back: "Hahaha no opinion. No judgment" and the two did not discuss the exchange again.

*August 23, 2019:* Jane spoke to John about a conference they were both attending in Korea, and how she could not stay longer to visit her family without missing classes. John told Jane that staying an extra week was not too long, and sent a text message to Jane saying that Jane could be his "tour leader" along with a smiling emoji. John then sent another text message adding "My HOT tour leader" with a flame emoji, a sunglasses emoji, and a smiling emoji. Jane ignored the text message and did not respond, but texted John three hours later about lab work.

*August 2019:* Around the same time as the text messages about the conference in Korea, John began referring to Jane as "cutie." Jane did not react to these references or tell John to stop.

*September 30, 2019:* Jane made an appointment with John so that he could observe her experiment and told John she would set up the experiment and return to the lab after class. John sent a text message to Jane saying she had left the oxygen on, but Jane responded that she did not use the oxygen and wrote: "But I swear I didn't touch the oxygen plug today." After exchanging additional messages about the oxygen, John wrote: "I believe you, you don't need to swear, cutie." Jane sent another message that said "proving my innocence LOL" along with a worried emoji.

*October 4, 2019:* John met Jane at her request in his office for approximately 30 minutes so that Jane could obtain assistance from John in understanding data John had

previously developed.  At the conclusion of their meeting, John asked Jane how she would "repay" him for assisting her and asked to whisper in her ear.  Jane declined the request and asked what John wanted, but someone interrupted their conversation.  When the conversation resumed, John asked Jane for a hug.  Jane declined and John followed Jane out of his office and into the lab.  John again asked Jane for a hug, and Jane gave him a "side hug" for no more than three seconds, during which their bodies were at a sharp angle to each other.  After the hug, John immediately left the building.

*October 18, 2019:* The lab director assigned a project to Jane based on data John had previously collected.  When Jane asked John for the data, John responded with an email, copied to the director, stating that Jane had "casually" asked for data that it took him two years to develop.  The director discussed the issue with John and told him she directed Jane to obtain the data, which belonged to the lab and not to John.  Later, John sent Jane an email apologizing and confirming he would provide her with the data.

*April 7, 2020:* Jane sent a text message to John about an issue at the lab.  John's response started with: "Hey cutie."  Jane wrote back by saying: "You can't call people here cutie LOL."  This led to an exchange about whether it was ever appropriate to refer to a woman as "cutie."  After the two sent additional messages related to the lab, John asked Jane if she was doing okay because she was "nicer" before the pandemic.  Jane said that John was being rude and that it was difficult for her to be nice and professional when he was acting that way.  John disputed that he was rude and wrote: "you need to grow up girl."

The investigators found that these and other interactions between Jane and John that they considered, when taken as a whole, did not amount to sexual harassment under Administrative Guide 1.7.1.  However, the investigators alternatively found that John

7

violated a different policy, Administrative Guide 1.1.1,[4] during the incidents on October 4, 2019; October 18, 2019; and April 7, 2020.  As to these incidents, the investigators found that John's conduct was inappropriate, unprofessional, rude, and demonstrated a lack of respect for Jane.

### D.    Notice of Outcome of Investigation

On March 26, 2021, Truong issued a written "Notice of Outcome of Investigation" to Jane and John.  Truong adopted all of the investigators' factual findings.  But Truong disagreed with the investigators' conclusion that John's conduct did not violate Administrative Guide 1.7.1.  Instead, Truong determined based on the "totality of the incidents" that John's conduct "was both subjectively and objectively offensive and was pervasive enough to meet the definition of prohibited sexual harassment as described in Administrative Guide 1.7.1."  Truong also determined that John's conduct, "taken as a whole," violated Administrative Guide 1.1.1.

Under the section entitled "Sanctions and Remedies," the notice listed the following remedies Stanford would implement to "restore or preserve" Jane's access to Stanford's educational program: (1) neither Jane nor John were permitted to contact or interact with each other in any form; (2) John could not participate in the weekly lab meeting if Jane was present; (3) Jane would continue her research with other members of the lab; and (4) John could not be at the lab at the same time as Jane and could not have access to her schedule.  Additionally, the notice stated that Truong would follow up with John "to take appropriate corrective action," and explained the procedure for initiating an appeal.

---

[4] Administrative Guide 1.1.1, also known as the University Code of Conduct, expresses that Stanford "is an institution dedicated to the pursuit of excellence and facilitation of an environment that fosters this goal.  Central to that institutional commitment is the principle of treating each University Community member fairly and with respect, and embracing diversity and inclusion."  It also states that Stanford "will take prompt action" to cease conduct that violates the policy and will "discipline those responsible."

### E. Parties' Administrative Appeals

Both parties submitted an appeal. Jane contended that the investigators incorrectly determined that some of the incidents did not independently constitute sexual harassment and felt that the remedies were not sufficient to restore her access to the lab. As for John, he argued that the investigators overlooked his version of the incidents and failed to consider that many of Jane's allegations were uncorroborated; that he was given fewer procedural rights than Jane, such as access to a lawyer; and that he was not provided all of the documents reviewed by the investigators. In the final section of his appeal, John noted he was "devastated" that his graduate school admission had been rescinded even though that was not a remedy listed in Truong's notice.

Elizabeth Zacharias, Stanford's Vice President for Human Resources, denied both appeals on April 30, 2021. On John's appeal, Zacharias found no procedural irregularities and that John did not identify any "new compelling evidence." Zacharias also found that the decision based on the findings was one that could be made by a reasonable decision-maker.

On July 1, 2021, Stanford's Deputy Chief HR Officer placed a written warning letter in John's personnel file. The letter described the outcome of the investigation and stated that John's conduct was "inconsistent with Stanford's policies and must not reoccur." John was "expected to communicate and work with others in a professional and respectful manner," and was notified that "[f]ailure to meet these expectations will result in additional corrective action up to and including" termination of his employment. John signed the letter acknowledging that he received the written warning on July 5, 2021.

### F. Petition for Writ of Mandamus

John filed a verified petition for writ of mandamus in the trial court in June 2021. Stanford filed a verified answer in March 2022. The trial court received briefing from the

parties and held a hearing on the petition in August 2022. On September 20, 2022, the trial court filed a written order and judgment denying John's petition.

## II.  DISCUSSION

Code of Civil Procedure, "[s]ection 1094.5 sets out the procedure for obtaining judicial review of a final administrative determination by writ of mandate." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 810 (*Fukuda*).) Such review is not limited to decisions made by public administrative agencies; "rather it applies to private organizations that provide for a formal evidentiary hearing," including private universities like Stanford. (*Gupta v. Stanford Univ.* (2004) 124 Cal.App.4th 407, 411; accord *Pomona College v. Super. Ct.* (1996) 45 Cal.App.4th 1716, 1722-1723 (*Pomona*) [Code of Civ. Proc. § 1094.5 applies to private universities].) The court's inquiry extends "to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code of Civ. Proc. § 1049.5, subd. (b).) The respondent in a mandamus proceeding abuses its discretion if it "has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

On appeal, John challenges the outcome of the investigation into Jane's allegations on both procedural and substantive grounds. We address each category of contentions in turn.

### A.  *Procedural Challenge*

#### 1.  *Fair Hearing*

Code of Civil Procedure, [s]ection 1094.5's reference to a "fair trial" is the "equivalent to a prescription that there by a fair administrative hearing." (*Pomona, supra*, 45 Cal.App.4th at p. 1730.) However, "[t]he ' "fair trial" ' requirement . . . is not synonymous with constitutional due process and does not mandate 'a formal hearing under the due process clause.' " (*Pinheiro v. Civil Service Com. for County of Fresno*

10

(2016) 245 Cal.App.4th 1458, 1463 (*Pinheiro*).) Instead, "[f]air procedure . . . is a more flexible judicially created concept applicable to private organizations in limited situations" (*Boermeester v. Carry* (2023) 15 Cal.5th 72, 87 (*Boermeester*)), and "[w]hat constitutes a fair procedure is not fixed or judicially prescribed." (*Rosenblit v. Super. Ct.* (1991) 231 Cal.App.3d 1434, 1445.) At the very least, "the common law doctrine of fair procedure requires private organizations to provide adequate notice of the charges and a meaningful opportunity to be heard." (*Boermeester, supra*, 15 Cal.5th at p. 90.) But neither" formal proceedings with all the embellishments of a court trial [citation], nor adherence to a single mode of process" are mandated. (*Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 555 (*Pinsker*).) "[T]he precise procedures necessary to provide a complainant with a meaningful opportunity to be heard "depend[ ] largely on 'the nature of the tendered issue.' " (*Boermeester,* at p. 87.)

We review a challenge to the procedural fairness of an administrative decision de novo "because the ultimate determination of procedural fairness amounts to a question of law." (*Nasha L.L.C. v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482.) We reverse "only if the alleged error prejudicially affected the appellant's substantial rights." (*Pinheiro, supra*, 245 Cal.App.4th at p. 1464.)

John argues he was denied a fair hearing under the SHARE investigation procedure for several reasons, including: (1) he did not receive adequate notice of the charges; (2) he was only permitted to respond to Jane's "bare allegations" and could not review the evidence; (3) he was treated differently than Jane because, unlike John, she was entitled to an attorney and was given a second interview; and (4) he did not have a right to a live hearing where he could cross-examine witnesses. None of these contentions are persuasive.

### 2. *Notice of the Charges and Access to Evidence*

The SHARE investigation procedure states that the individual assigned to conduct an investigation "will advise the Respondent of the allegations against them in writing in

11

a Notice of Concern." Stanford provided John with a "Notice of Concern" on October 9, 2020. The notice indicated that Stanford received a report that John had engaged in conduct with a graduate student that may have violated Stanford's sexual harassment policy described in Administrative Guide 1.7.1. To that end, the notice included the following specific allegations: "You engaged in inappropriate behavior toward the Complainant, including asking to whisper in the Complaint's ear, asking for a hug, and asking how she would 'repay' you after you provided her with research-related data; [¶] You made inappropriate comments, including sending the Complainant unwanted and unprofessional text messages; [¶] Your behavior persisted despite the Complainant asking you to stop."

John claims the information in the Notice of Concern was deficient in two ways: first, it did not reference Administrative Guide 1.1.1, which section he was ultimately determined to have violated, and second, it did not include the factual allegations underlying his purported violations. We reject both contentions.

First, while John is correct that the notice listed only Administrative Guide 1.7.1 and not Administrative Guide 1.1.1., the latter policy was subsequently referenced in the written notice Truong issued to John detailing the outcome of the investigation. Despite that reference, John did not include in his administrative appeal an objection to Administrative Guide 1.1.1 based on lack of notice. Nor did John raise the issue in the trial court. Instead, he declared in his verified petition that he was "provided notice before March 22, 2021 that his alleged conduct could potentially violate Administrative Guide 1.1.1." Under these circumstances, we find that John is bound by his admission and has forfeited a challenge based on insufficient notice of Administrative Guide 1.1.1. (See *Uram v. Abex Corporation* (1990) 217 Cal.App.3d 1425, 1433 [allegations in a complaint constitute judicial admissions]; *Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217, 222, fn. 3 [complaint's factual allegations "are conclusive concessions of the truth of a matter and effectively remove it from the issues"]; see also *Doe v. Occidental College*

12

(2019) 40 Cal.App.5th 208, 225; *Doe v. Univ. of Southern Cal.* (2018) 28 Cal.App.5th 26, 37 (*USC II*) ["Because this issue was not raised during the administrative proceedings or in the superior court, . . . it would normally be deemed forfeited"]; *Doe v. Univ. of Southern Cal.* (2018) 29 Cal.App.5th 1212, 1230 (*USC III*) ["Generally, a party cannot raise new issues or change the theory of a cause of action for the first time on appeal"]; S*outhern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 548-549 [claim that a hearing was unfair because an entity acted as both prosecutor and adjudicator was forfeited where the claim was not raised at the administrative hearing].)

Second, as for notice of Jane's factual allegations, John accurately recognizes that he must be " 'told what he is accused of doing and what the basis of the accusation is.' " (*Doe v. Univ. of Southern Cal.* (2016) 246 Cal.App.4th 221, 240 (*USC I*).) At the same time, " '[t]he rules of pleading that apply in ordinary civil actions do not apply to administrative proceedings. The courts consider whether the accused received fair notice, apart from any technical requirements of pleading; what is required is disclosure of charges adequate to allow the accused to prepare a defense and to avoid being disadvantaged by surprise at the hearing.' " (*Alpha Nu Assn. of Theta Xi v. Univ. of Southern Cal.* (2021) 62 Cal.App.5th 383, 418.)

Here, the "Notice of Concern" referenced (1) John's "inappropriate behavior" toward Jane, including asking to whisper in her ear, asking her for a hug, and asking how she would "repay" him for providing research data; (2) his "inappropriate comments" in "unwanted and unprofessional text messages"; and (3) that John's behavior persisted despite Jane asking him to stop. Moreover, John was provided additional detail about Jane's allegations during his interview with the investigators. The investigators' notes indicate that they discussed with John the specific communications and incidents between Jane and John that were ultimately outlined in the report explaining their findings. The notes further reflect that the investigators raised with John the allegations concerning his

13

conduct toward Jane, including his use of the word "cutie" and his requests for a hug and to whisper in her ear. Between the "Notice of Concern" and the additional information provided by the investigators during his interview, John was adequately advised of " 'what he [was] accused of doing' " and " 'what the basis of the accusation [was].' " (*USC I, supra*, 246 Cal.App.4th at p. 240.)

Although John was not given access to all of the written documents reflecting Jane's communications that were reviewed by the investigators, we cannot say under these circumstances that John was deprived of adequate notice without such access even if we assume that John was entitled to review all of the documents. (Contra, *Gilbert v. City of Sunnyvale* (2005) 130 Cal.App.4th 1264, 1280 [employee subject to disciplinary proceedings is entitled to "an explanation of the employer's evidence" and "notice of the substance of the relevant supporting evidence"].) The record shows that John was a party to the text messages and emails underlying the alleged policy violations, and was therefore already familiar with their content. Most of the other documents contained Jane's entire communication history with another student witness. As the investigators' report reveals, this latter category of documents comprised 1,571 pages and was used by the investigators to corroborate, and in several instances discredit, Jane's version of events.

John cites *USC I* in support of his claim that he was entitled to more information about Jane's allegations, but the facts of that case are quite different. There, the university notified the student facing discipline of the factual basis for the alleged violations, but ultimately sanctioned him for different conduct of which he was never notified was at issue. (*USC I, supra*, 246 Cal.App.4th at p. 225.) The appellate court held that because the student "was sanctioned based on activities that he was never informed might be the cause for sanctions, [the student] was not provided with sufficient notice." (*Id.* at p. 244.) Unlike *USC I*, this case does not involve a comparable "bait and

14

switch" because John was sanctioned for the same conduct alleged in the "Notice of Concern" and related to him by the investigators during his interview.

### 3. *Different Treatment*

The SHARE investigation procedure permits the parties to "have a support person accompany them through the process," and states that the "SHARE Office will identify a support person to assist a party . . . upon request." The procedure further describes a "Student option," through which Stanford "identified local attorneys who are available to provide student Parties with up to four hours of consultation once a Notice of Concern is issued." Stanford provides students with a list of available attorneys and pays them directly for up to four hours of consultation time. However, the procedure also specifies that students "are not obligated to use this resource or to follow any guidance provided by an attorney."

John argues the attorney consultation provision rendered the SHARE investigation procedure fundamentally unfair because it permitted Stanford to treat the parties differently. As John puts it, "only Jane was entitled to an attorney." But that is not an entirely accurate characterization of the attorney consultation provision. As described, the provision allowed both parties to have a support person appointed for them and merely provided Jane, an enrolled university student as opposed to a paid employee, with the limited opportunity to consult with an attorney at Stanford's expense. The provision did not entitle Jane to legal representation during the proceeding, free or otherwise, or require Jane to consult with an attorney. Nor did the provision preclude John from consulting with or retaining an attorney, and John was explicitly informed by Truong that he could do so after requesting an extension of the appeal deadline. The only potential difference in treatment between Jane and John under the provision was that Stanford would pay an attorney selected from a compiled list to consult with Jane for up to four hours, and John does not persuasively explain how such a difference denied him a "meaningful opportunity to be heard." (*Boermeester, supra*, 15 Cal.5th at p. 87.)

15

John also contends the process was unfair because Jane was interviewed twice while he was only interviewed once. Specifically, he complains that Jane "received an opportunity to respond to John's allegations during a second interview." But the record does not show that John requested another interview at any time. Nor does John describe what additional information he would have provided had he received a second interview. That said, John has not demonstrated how the difference in the number of interviews denied him an opportunity to be heard, especially since John was able to respond to Jane's allegations during his first interview and has not identified any new allegations arising from Jane's second interview. (See *USC II, supra*, 28 Cal.App.5th at p. 40 [rejecting claim of procedural unfairness where there is no resulting prejudice].) As such, the fact that John was only interviewed once did not prejudicially affect his substantial rights. (*Pinheiro, supra*, 245 Cal.App.4th 1458, 1464.)

### 4. *Lack of a Formal Hearing with Cross Examination*

John complains the fairness of the proceeding was "substantially affected" because Stanford did not conduct a formal hearing at which he could cross-examine witnesses. In response, Stanford contends that a formal hearing was not required to comport with principles of due process because John was not facing severe consequences. Given this disagreement, we must decide the appropriate level of process that John was due.

"When crafting the precise procedures necessary to provide a meaningful opportunity to respond [ ] a private university must balance competing interests," including the accused's "interests in a fair procedure . . ., the accuser's interest in not being retraumatized by the disciplinary process, and the private university's interests in maintaining a safe campus and encouraging victims to report instances of sexual misconduct or intimate partner violence without having to divert too many resources from its main purpose of education." (*Boermeester, supra*, 15 Cal.5th at p. 93.) As we have noted, however, fair procedure does not normally entail formal proceedings "with all the embellishments of a court trial." (*Pinsker, supra*, 12 Cal.3d at p. 555.)

16

John relies on *Knight v. South Orange Community College District* (2021) 60 Cal.App.5th 854 (*Knight*), to advocate his position that Stanford should have conducted a formal hearing with cross-examination. We find *Knight* instructive, but not for the same reason as John. In *Knight*, two female community college students complained that the petitioner, a male student, was following them, taking photos of one of them on his phone, and touching them. (*Id.* at p. 857.) After the first student's complaint was informally resolved, the college received a second complaint from a different student alleging similar behavior by the petitioner. (*Id.* at pp. 859-860.) The college sent a letter to the petitioner formally apprising him of the allegations and conducted an investigation. (*Id.* at p. 860.) The college initially determined that the petitioner should be suspended for the remainder of the semester, which entitled him to a disciplinary hearing upon request. (*Id.* at pp. 861-862.) The petitioner requested a hearing, but it was eventually canceled due to witness unavailability. (*Id.* at p. 862.) Because the hearing could not proceed, the college issued a disciplinary notice to the petitioner in lieu of suspension. (*Id.* at pp. 862-863.)

The petitioner in *Knight* sought a writ of mandate, which the trial court granted and ordered the college to set aside its decision. (*Knight, supra*, 60 Cal.App.5th at p. 863.) However, the Court of Appeal reversed. (*Id.* at p. 872.) In doing so, the court identified "two levels of due process due that apply to student discipline," the "first level" being "notice of the charges and of the evidence and an opportunity to state the student's side of the story," and the "second level" being a "formal hearing, with witnesses and cross-examination." (*Id.* at p. 865.) After reviewing other comparable cases addressing student discipline, the court determined that the petitioner was not entitled to "second level" due process before he was issued a disciplinary notice because "[t]hat second level of due process becomes mandatory only before the penalty of suspension can be imposed upon an objecting student." (*Id.* at p. 870.) "[F]irst-level due process—notice and an opportunity to respond—is required before a written reprimand may be placed in a

17

student's record." (*Id.* at p. 872.) Since the college provided the petitioner that level of process, his petition for writ of mandate could not succeed. (*Ibid.*)

The *Knight* court relied on the United States Supreme Court's opinion in *Goss v. Lopez* (1975) 419 U.S. 565 (*Goss*). There, the court held that when a student is facing suspension of ten days or less, the student must be "given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." (*Id.* at p. 581.) The court stopped short of holding "that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." (*Id.* at p. 583.)

Although both *Knight* and *Goss* were decided in the context of student rather than employee discipline, we nonetheless ascertain guidance for assessing the level of due process that must be afforded in cases involving milder forms of sanctions, such as reprimand letters and short suspensions. As *Knight* and *Goss* teach, when that sort of deprivation is contemplated, an effective notice and an informal hearing permitting the accused to recount their version of events is enough to "provide a meaningful hedge against erroneous action." (*Goss, supra*, 419 U.S. at p. 583; accord *USC I, supra*, 246 Cal.App.4th at p. 240 [formal hearing not required before imposing discipline on a student but the student must be " 'given an opportunity to explain his version of the facts' " and must be " 'be told what he is accused of doing and what the basis of the accusation is.' "]; *Stanton v. City of West Sacramento* (1991) 226 Cal.App.3d 1438, 1442 [public employee not entitled to hearing process outlined in *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194 before issuance of written reprimand].)

The severity of the sanction is also relevant to determining whether an opportunity for cross-examination must be provided. Again, in the context of student discipline, courts of appeal have held that "[w]here a student faces *a potentially severe sanction*

18

from a student disciplinary decision and the university's determination depends on witness credibility, the adjudicator must have the ability to observe the demeanor of those witnesses in deciding which witnesses are more credible." (*USC III, supra*, 29 Cal.App.5th at p. 1234, emphasis added; accord *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1070 (*Claremont McKenna*).) But otherwise, an opportunity for the accused to cross-examine the accuser or other witnesses is not generally required, as our Supreme Court recently confirmed. (*Boermeester, supra*, 15 Cal.5th at p. 92 ["We must decide whether fair procedure requires private universities to provide accused students the opportunity to directly or indirectly cross-examine the accuser and other witnesses at a live hearing with the accused student in attendance . . . . we hold that it does not"]; *Doe v. Regents of the Univ. of Cal.* (2016) 5 Cal.App.5th 1055, 1084 (*Regents*) ["There is no requirement under California law that, in an administrative hearing, an accused is entitled to cross-examine witnesses"].)

We conclude that the sanctions Stanford imposed on John, consisting of restrictions on John's conduct toward Jane in the lab and a written warning in his personnel file, are analogous to the reprimand discussed in *Knight* and the short suspensions addressed in *Goss*. Thus, John was entitled to the level of due process he received, comprised of meaningful notice and an opportunity to be heard rather than a formal hearing with witness testimony and cross-examination. (See *Knight, supra*, 60 Cal.App.5th at p. 872.) Moreover, unlike other cases where the investigators were faced with "he said, she said" statements about what occurred between the parties (see, e.g., *USC III, supra*, 29 Cal.App.5th at pp. 1235-1237; *Claremont McKenna, supra*, 25 Cal.App.5th at p. 1070), the evidence in this case consisted of extensive documentary evidence reflecting the communications between Jane and John that the investigators could independently assess. Therefore, while the investigators commented on the parties' credibility in their report, their determination did not necessarily depend on whether Jane or John was more credible.

19

John avers that he was entitled to heightened due process because he suffered an additional, more serious sanction; that is, he infers that the outcome of the investigation "influenced" Stanford's decision to revoke his admission to a graduate program. We disagree with that premise because the record does not support it. Stanford utilized the SHARE procedure to investigate Jane's allegations because John was a university employee, not a prospective student, and nothing in the record shows that either Truong or Zacharias concluded that John's admission to the graduation program should be rescinded as a sanction or remedy based on the investigator's findings. In fact, the only information in the record supporting any connection between the investigation and the rescission of John's admission is contained in one footnote from the brief Stanford filed in opposition to John's petition for writ of mandamus, which emphasized that an entirely different decisionmaker—the chair of the department—determined that John's admission should be rescinded, and that this decision was made even before Zacharias issued a decision on the parties' appeals. In other words, the sparse information on this topic shows that the rescission of John's admission was external to the outcome of the investigation into Jane's allegations.

In sum, John has not shown that the procedures Stanford utilized denied him a fair hearing.

### B.    *Substantive Challenge*

We now turn to John's substantive challenge to Stanford's decision, about which he makes a series of arguments concerning whether the findings, determination, and sanctions are supported by the evidence.

Before addressing these issues, however, we clarify our standard of review. "In the trial court, if the administrative decision substantially affects a fundamental vested right, the court must independently review the record to determine whether the weight of evidence supports a factual finding, whereas the substantial evidence test applies when a fundamental right is not at issue." (*O'Brien v. Regents of Univ. of Cal.* (2023) 92

Cal.App.5th 1099, 1116 (*O'Brien*).)  However, no matter the right involved or the standard applied by the trial court, "the standard of review on appeal of the trial court's determination is the substantial evidence test." (*Fukuda, supra*, 20 Cal.4th at p. 824.) "The difference is that *our focus* varies with the standard of review employed by the trial court.  [Citation.]  ' "If a fundamental vested right was involved and the trial court therefore exercised independent judgment, it is the trial court's judgment that is the subject of appellate court review.  [Citations.]  On the other hand, if the superior court properly applied substantial evidence review because no fundamental vested right was involved, then the appellate court's function is identical to that of the trial court.  It reviews the administrative record to determine whether the agency's findings were supported by substantial evidence." ' " [Citation.]" (*O'Brien,* at p. 1116, italics added.)

In his opening brief on appeal, John referenced both the independent judgment and the substantial evidence standards and argued that we should independently review the administrative record because his fundamental vested rights were affected.  As we have explained, however, "the appellate court applies a substantial evidence test, regardless of whether a fundamental right is involved." (*O'Brien, supra*, 92 Cal.App.5th a p. 1116.) Furthermore, John has not argued that the trial court erred by failing to apply the independent judgment standard, and Stanford and the trial court came to the same conclusions.  Thus, "[a]t this stage, the issue is effectively academic" because the scope of our review is the same whether the focus is the trial court's judgment or Stanford's findings since the former effectively adopted the latter without change.  (*Fort Mojave Indian Tribe v. Dept. of Health Services* (1995) 38 Cal.App.4th 1574, 1590.)[5]

_____

[5] Even if John had argued that the trial court erred by failing to apply the independent judgment standard, we would find this case does not involve a fundamental vested right.  In his petition, John declared that independent review was appropriate because he "possesses a vested fundamental contractual right to pursue his Ph.D. at Stanford."  But John cited no authority supporting this proposition, and we are unaware of any California decisions so holding.  To the contrary, the courts of appeal have (continued)

We therefore review Stanford's findings by applying the substantial evidence standard. In doing so, "we do not 'weigh the evidence, consider the credibility of witnesses, or resolve conflicts in the evidence or in the reasonable inferences that may be drawn from it.' " (*Do v. Regents of the Univ. of Cal.* (2013) 216 Cal.App.4th 1474, 1492 (*Do*).) Nor may we simply substitute our own judgment for that of the agency. (*Regents, supra*, 5 Cal.App.5th at p. 1073.) "We examine all relevant evidence in the administrative record and view that evidence in the light most favorable to the judgment, resolving all conflicts in the evidence and drawing all inferences in support of the judgment." (*Do,* at p. 1490.) "[T]he testimony of a single witness, even that of a party, is sufficient to provide substantial evidence to support a finding of fact." (*Regents,* at p. 1074.)

It is John's burden "to prove there was an abuse of discretion through the issuance of a decision that was unsupported by substantial evidence." (*Do, supra*, 216 Cal.App.4th at p. 1490.) "Only if no reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence." (*Ibid.*; *Hongsathavij v. Queen of Angels/Hollywood Presbyterian Medical Center* (1998) 62 Cal.App.4th 1123, 1137 ["an appellate court must uphold administrative findings unless the findings are so lacking in evidentiary support as to render them unreasonable"].)

Here, we find substantial evidence supports Stanford's decision. After reviewing the investigators' extensive findings recounted above regarding several interactions between Jane and John in 2019 and 2020, Truong, and later Zacharias, determined based

rejected the idea that there exists a fundamental right to higher education. (See *Gurfinkel v. Los Angeles Community College Dist.* (1981) 121 Cal.App.3d 1, 6; *Kirk v. Regents of Univ. of Cal.* (1969) 273 Cal.App.2d 430, 440.) In any event, we have explained why the decision to rescind John's admission to the graduate program was not a sanction imposed through the investigation of Jane's allegations.

on the "totality of incidents" that John's conduct constituted prohibited sexual harassment in violation of Administrative Guide 1.7.1. and was sufficiently rude, disrespectful, and unprofessional in violation of Administrative Guide 1.1.1.  Given the nature of the interactions—some of which involved John seeking personal or close contact with Jane, John sending flirtatious and suggestive messages to Jane, John referring to Jane as "hot" and a "cutie," and John requesting repayment from Jane in return for professional assistance—we cannot say that no reasonable person could reach the same conclusion. (*Do, supra*, 216 Cal.App.4th at p. 1490.)

In his appellate briefing, John emphasizes his own version of the incidents in an effort to demonstrate that the decision was unsupported by substantial evidence.  John also claims that his conduct was neither sexual in nature nor disrespectful toward Jane, and offers different explanations and context for his communications with her.  These contentions, however, do not discount the extensive evidence and reasonable inferences that do support the decision, even if John's alternative version of the facts is plausible. Indeed, our role is not to reweigh competing evidence or resolve any conflicts therein. (*Do, supra*, 216 Cal.App.4th at p. 1492.)  "We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness" of the decision on review.  (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.) Furthermore, we must decline John's invitation to reevaluate the parties' credibility. (*Regents, supra*, 5 Cal.App.5th at p. 1074 ["Credibility is an issue of fact for the finder of fact to resolve"].)

We also reject John's argument that the sanction was excessive.  Putting aside the rescission of his graduate school admission, which decision we have determined was not a sanction imposed through the investigation of Jane's allegations, John was given restrictions on his conduct toward Jane and a written warning in his personnel file.  With these sanctions, John has not demonstrated that this is an "exceptional case" where "reasonable minds cannot differ on the propriety of the penalty."  (*Deegan v. City of*

*Mountain View* (1999) 72 Cal.App.4th 37, 47.) And his claim that this case is exceptional because Truong "made credibility determinations that conflict with the investigators' findings" is unsupported by the record.

Finally, John has not shown that Stanford failed to follow its own procedures. The crux of John's argument on this topic is the contention that his conduct did not constitute sexual harassment, which contention we have already rejected. And John has not demonstrated, rather than merely declared, that any departure in the investigation timeline outlined by the SHARE procedure disadvantaged him or caused him prejudice. (See *USC II, supra*, 28 Cal.App.5th at p. 40.)[6]

### III. DISPOSITION

The judgment is affirmed. Stanford shall recover its costs on appeal.

---

[6] Additionally, we fail to see how Education Code section 94367 applied to John because he was not a university student, even assuming the statute constituted a "procedure" that Stanford was required to follow. (See *Antebi v. Occidental College* (2006) 141 Cal.App.4th 1542, 1546-1547 ["The Leonard Law, Education Code section 94367 et seq., prohibits private universities from disciplining students for speech that would be protected by the First Amendment [and article I, section 2 of the California Constitution] if made off campus"].)

24

_____
ADAMS, J.*

WE CONCUR:

_____
GREENWOOD, P. J.

_____
GROVER, J.

*Doe v. The Leland Stanford Junior University*
H050567

_____

* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.